ELLA MAUDLIN v. AMERICAN SAVINGS & LOAN ASSOCIATION.[1]

January 7, 1896.

Nos. 9404—(96).

**Building and Loan Association—Mortgage—Stock Dues.**

The defendant, a "national building and loan association," doing business under Laws 1889, c. 236 (G. S. 1894, §§ 2855–2894), "advanced" or loaned to plaintiff $6,000 as the matured value of her stock, less $6,000 "premium" bid by her for the loan. It was assumed that the stock would mature in nine years. The defendant took from her a mortgage to secure the payment of the interest on the $6,000 advanced, and the payment of the monthly dues on the stock for the nine years. The mortgage contained a stipulation that a default in the payment of an instalment of interest or stock dues for six months should render the stock dues for the whole nine years immediately due and payable, and that the same might be enforced and recovered at once as liquidated damages, together with all interest and fines then due, and all costs and disbursements. Default having been made in the conditions of the mortgage, the defendant foreclosed, treating the stock dues for the whole nine years as presently due. *Held,* that the amount due on the mortgage for stock dues was only their present worth in gross.

**Same—Liquidated Damages.**

The stipulation that gross amount of the stock dues, without any rebate or discount for the time they had run, might be recovered as "liquidated damages," is nonenforceable, because the case is simply one of the breach of a contract for the payment of money where the measure of damages is susceptible of definite measurement.

Action in the district court for Hennepin county by plaintiff mortgagor against defendant mortgagee to recover an alleged surplus of the amount bid by defendant at mortgage foreclosure sale over the amount due upon the mortgage. The case was tried before Jamison, J., who found in favor of plaintiff. From a judgment in favor of plaintiff for $2,395.02, defendant appealed. Affirmed.

*Chas. M. Cooley* and *Rea, Hubachek & Healy,* for appellant.

*Jones & Babcock* and *J. B. Atwater,* for respondent.

MITCHELL, J. The defendant is a corporation organized under the laws of this state. The general nature of its business, as ex-

pressed in its articles of association, is "to assist its members in saving and investing money, and in buying and improving real estate, and in procuring money for other purposes by loaning or advancing, under the mutual building society plan, to such of them as may desire to anticipate the ultimate value of their shares, funds accumulated from monthly contributions of its stockholders, and also such other funds as may from time to time come into its hands." The law under which it professed to be doing business was Laws 1889, c. 236, since amended by Laws 1891, c. 131 (see G. S. 1894, §§ 2855–2894). In other words, it professed to be a building and loan association, doing a general business. That is what is known as a "national," as distinguished from a "local," building and loan association.

The only provisions of the act of 1889 that can be at all material here are as follows: The business authorized by that act is the accumulation of "the savings and funds of its members, and lending them only the funds as accumulated." Section 4 of the act provided that "for every loan made a note, nonnegotiable, or bond, secured by first mortgage on real estate, shall be given, * * * and shall be accompanied by a transfer and pledge of the shares of the borrowers to the association." Section 22 provided that "the name 'building and loan association,' as used in this act, shall include all corporations, societies, organizations or associations doing a saving and loan or investment business on the building society plan, whether mutual or otherwise, and whether issuing certificates of stock, which mature at a time fixed in advance, or not." Section 25 provided that "any premiums taken for loans made by any association governed by this act shall not be considered or treated as interest nor render such association amenable to the laws relating to usury." Section 27 provided that "any shareholder whose stock has not been declared forfeited in such association and whose share or shares are not pledged upon a loan may withdraw such share or shares from the association at any time after one year by giving at least sixty days' notice in writing to the secretary of his intention to do so. Upon receipt of such notice the same may be considered a withdrawal by such person and the association may within sixty days dispose of said stock and the member shall assign the same for that purpose. At the end of said sixty days the association shall pay to the member so surrendering as follows: If said stock is not more than two years old

all amounts paid in by such member upon such stock, except the sum paid as membership fee and fines, and the amount set apart upon such shares by said association as an expense fund, which expense fund, however, shall not exceed the amount fixed in this act; if such stock is more than two years old, the member upon such surrender shall receive in addition to the amount above specified at least three-fourths of all profits standing to the credit of such shares."

The by-laws of the association provided that "each member shall make his payments on stock in instalments of sixty cents per month per share." "Whenever, in any case, payments upon stock have been in arrears for six months or more, such stock shall be sold at auction for the purpose of paying the arrearages. The surplus arising from such sale, after paying the back monthly dues and fines, shall be paid to the original owner. If the stock does not bring enough to pay what is due thereon, it shall be bid in by the association, and canceled, and the amount standing to the credit thereof in the loan fund shall be divided among the other shares as profits.  *  *  *  If any monthly payments are not paid when due, a fine of ten cents per share shall be imposed for each and every month the payment may be in arrears.  *  *  *  The payments on each share shall be sixty cents per month for each and every month until maturity, commencing one month from the date of the certificate.  *  *  *  The funds of said corporation which shall belong to the loan fund shall be loaned to the member offering to pay the highest premium therefor, in addition to the stipulated six per cent. per annum, upon such terms and security as the board of directors may from time to time approve: provided that the rate of interest shall be six per cent. per annum. Payments of interest and premium shall be made either in advance at the time the loan is made, or monthly, as the directors may deem best. All other payments shall be made monthly. The rate of interest will be six per cent. per annum, payable monthly.  *  *  *  The mortgage will be for the amount of the loan and premium, but interest will not be charged on the premium, but on the money actually loaned." "Loans on real estate may be repaid at any time on thirty days' notice. If a borrower therein neglects to pay any interest, dues, or monthly payments for a period of six months from the time the same shall be due,  *  *  *  then the whole principal mentioned in the mortgage and note or bond shall at once be-

come due and payable without notice, and proceedings may be commenced forthwith to foreclose such mortgage or to collect said bond or note in such manner as the board of directors may deem best." The association did not issue certificates of stock to mature at a fixed date, but it estimated that stock would mature in nine years.

On or about September 26, 1889, the plaintiff, Ella Maudlin, called upon F. B. Stoneman, manager of the loan department of the defendant association, with a view to obtaining a loan of $9,000. The said Stoneman explained to the plaintiff the defendant's method of making loans, telling her that, in order to obtain a loan, she would have to become a member of the defendant association by subscribing for shares of stock of the defendant, and that she would have to make a written application for the loan, and bid a premium for the privilege of obtaining the same. He told her the bids being made by other applicants for loans were about $50 per share, and that, to obtain a loan of $9,000 at that rate of premium bid, it would be necessary for her to subscribe for 180 shares of stock. Thereupon the plaintiff subscribed for 180 shares of the capital stock of the defendant association, and a certificate therefor was duly issued to the said plaintiff, dated September 28, 1889.

This certificate was subject to the following terms and conditions: First. She should pay 60 cents monthly on each share of stock until it matured or was withdrawn. Second. If a monthly payment was not paid when due, a fine of 10 cents per share should be imposed. Third. "Stock in this association is nonforfeitable; but, if a monthly payment on any share becomes past due for a period of sixty days or more, such share may be sold at auction for the purpose of paying the arrearages. The proceeds of the sale shall first be used to pay all back monthly payments and fines and other money due the association; the balance remaining after paying all accrued fines and monthly payments and other money as aforesaid shall be paid to the member in whose name the stock stands at the time of sale. If the stock brings no more than enough to pay the accrued fines and monthly payments, it shall be bid in by the association and canceled, and all money standing to the credit thereof in the loan fund shall be considered profit to the other shareholders. Provided, however, that no stock which is one year or more old shall be sold for less than its withdrawal value."

Thereupon the plaintiff filed an application for the loan of $9,000, to be secured by bond and mortgage on real estate, and bid therefor a premium of $50 per share of her stock, viz. $9,000. The bid was accepted, the loan made, and the $9,000 paid over to her, less certain charges, which are not in controversy. The plaintiff and her husband at the same time executed to the association a bond and mortgage. After reciting that plaintiff had bid $9,000 as a premium for an advancement to her of $9,000, by way of anticipation of the value at maturity of her 180 shares of stock, the condition of the bond was that the obligors should pay to the association, on or before nine years (the estimated date of the maturity of the stock), the sum of $18,000, with interest on $9,000 at 6 per cent. per annum, payable monthly, or should pay the sum of $108 per month as and for the monthly dues on the 180 shares of stock, and should also pay all instalments of interest on the $9,000, and all fines on the stock, until such stock became fully paid, and of the value of $100 per share, and then surrender the stock to the association; provided, however, that, if default should be made in the payment of interest or stock dues for the space of six months, then the whole principal sum aforesaid should, at the election of the association, become immediately due and payable, "and the sum of $11,664, less whatever sum has been paid said association as and for the monthly dues on said 180 shares of said capital stock at the time of such default, may be enforced and recovered at once, as liquidated damages, together with and in addition to all interest and fines then due, and all costs and disbursements."

It will be observed that $11,664, designated in the bond as "liquidated damages," is the total amount of monthly dues on the 180 shares of stock for nine years, the time when it was assumed or estimated it would mature. The mortgage recited that it was given to secure an advancement on 180 shares of stock, the monthly payments on which amounted to $108 per month, which the mortgagors covenanted and agreed to pay until the stock became fully paid. It further provided that if the mortgagors should pay the sum of $18,000 and interest, according to the conditions of the bond, on or before nine years, with interest on $9,000 at 6 per cent. per annum monthly, or should pay all instalments of interest which became due on the bond, and all fines and monthly payments on the stock,

until the stock became fully paid in, and of the value of $100 per share, and before any of said instalments of interest or monthly payments shall have been past due for six months, and shall then surrender the stock to the association in payment of the bond, then the deed to be void; but, if default should be made in any of these conditions, then the whole principal sum or sums secured by this mortgage and interest thereon accrued up to the time of the default should, at the election of the association, become due and payable immediately, and the association should thereupon be authorized to foreclose the mortgage at once, "for such sum or sums and interest and money paid as may be due and payable by the terms of said bond hereby secured," and sell the premises, and, out of the moneys arising therefrom, retain "the principal and interest then accrued on the sum or sums so elected to be foreclosed for," together with insurance, taxes, costs, disbursements, and attorney's fees, and pay the surplus to the mortgagors.

About the last of February, 1890, the plaintiff, being desirous of obtaining a release of part of the mortgaged premises, made an arrangement with the association by which, on repayment by her of $3,000 of the sum loaned, and all sums due the association up to March 1, 1890, for interest on the $9,000 loaned, and for monthly payments and fines on the stock, part of the mortgaged premises were released by the association, and 60 shares of the stock surrendered by plaintiff and canceled by the association; and it was then mutually agreed that the remaining $6,000 should be considered a new loan of that amount, as of the date of March 1, 1890, on the same terms as the original one, and that the old papers should stand as security and evidence of the same.

No further payments were ever made by the plaintiff, and in September, 1890, the association elected to declare the whole sum secured by the mortgage due and payable, and proceeded to foreclose by advertisement claiming, in the notice of sale, as due $8,073. At the sale, on October 20, 1890, the property was bid in by the association for $8,237.85, the amount claimed to be due on the mortgage, with insurance paid, costs, and disbursements. The way the amount was arrived at was as follows: Two-thirds of $11,664, named in the bond as liquidated damages, being dues for nine years on 120 shares of stock, $7,776; six months' fines on same, $72; six

months' interest on $6,000, $180; insurance paid on property, $45; interest from date of notice to date of sale, $45; costs of foreclosure, $119.85,—total, $8,237.85. If the first and second items are correct, no question is made as to the correctness of the others. The plaintiff, however, claims, and the trial court so held, that there was only due on the mortgage as follows: Amount loaned or advanced, $6,000; interest on the same, $230; insurance paid, $45; costs of foreclosure, $119.85,—total, $6,394.85.

This action was brought to recover the alleged surplus of $1,843 of the amount bid over the amount due according to this method of computation. The contention of the plaintiff is that, under the statute, the defendant has no authority to take a note or mortgage to secure the payment of future stock dues, or for any other or greater sum than the amount of money actually loaned or advanced, and interest thereon; and, therefore, that this mortgage could only stand as security for the $6,000 and interest.

It is true that the statute under which the defendant is organized and doing business is the measure of its power, and that any mortgage taken by it is operative only so far as authorized by the statute and the articles of association and by-laws which are in conformity with the statute. But in view of the very broad provisions of the statute authorizing such associations to do business "on the building society plan," and to take premiums for loans, we are unable, at least on any ground suggested by counsel, to hold that the association may not take a mortgage to secure the payment of dues on stock until it matures, which will presumably make such stock worth the amount "loaned" or "advanced," plus the "premium" bid.

So-called "building societies," operated on the plan of the defendant, have so often become the instruments of oppression and extortion as to call down the censure of some eminent courts. The original purpose of building societies, viz. to enable people of small means to build or buy homes, is entirely wanting. They are merely savings and loan associations, retaining the forms and nomenclature of building societies. They still retain in form the idea that they are dealing with community funds, and that the borrower, being a member, is also a lender; but this is so in theory rather than in fact. A necessitous applicant for a loan usually takes stock merely for the purpose of obtaining the loan. It would seem that none

but those who are ignorant and improvident, or who are under imperative financial straits, would take a loan on such hard terms as the one under consideration; for, when reduced to its last analysis, plaintiff's contract was to pay at the end of nine years a bonus of $9,000 for a loan of $9,000, and in the meantime pay interest on the amount loaned at 6 per cent. per annum, payable monthly. Such persons almost invariably soon default in the payment of interest and dues,—a result which it is not uncharitable to assume that the association must anticipate. Then follows a foreclosure, whereby the stock is wiped out, and, under various names, a most exorbitant rate of interest is secured, amounting in the present case to over 54 per cent. per annum. It is idle to attempt to shut our eyes to the fact that the practical effect of the statute is to grant exemption to such associations from the operation of the usury laws of the state by calling the borrower a "member," and substituting the word "redeeming" or "advancing" for "lending," and "premium" for "bonus."

As no question is raised as to the validity of the statute, we are not called on here to consider whether such a law is subject to the objection of being class legislation. If the legislature has enacted unwise laws, the courts are not responsible for it. These associations must be protected in all the rights which the statutes give them, but it is the duty of the courts to see that they do not exercise powers which they do not possess or abuse those which they have.

The conditions of the bond and of the mortgage in this case are coincident, the conditions of the latter securing all the conditions of the former. Their meaning is not difficult to ascertain. Treating the $9,000 advanced as the matured value of the stock, less the $9,000 premium bid for this advance, the mortgage is to secure the interest on the $9,000 advanced until the stock matures (nine years), and the payment, at the end of that time, of the matured value of the stock ($18,000), or, what is equivalent to the same thing, the payment of the stock dues for nine years, which, it is assumed, would at the end of that time make the stock worth $18,000; a default in the payment of an instalment of interest or dues for six months to render the stock dues for the whole nine years immediately due and payable, as liquidated damages. Upon such a default, the defendant proceeded on the theory that the amount presently due on the mort-

gage was the aggregate amount of these monthly dues for the entire nine years, without any rebate of interest, so as to reduce the amount to their present value in gross. Only seven monthly instalments of dues were payable at the date of the foreclosure. The remainder were payable monthly, without interest, during a period of eight years. Of course, this foreclosure terminated and dissolved the relationship of membership between the plaintiff and the association, and wiped out the stock.

According to its own theory, as well as the letter of the contract, the association bid in the property for $360 more than was due on the mortgage, for the plaintiff was given no credit for the five instalments of dues which she had paid on the 120 shares of stock. But the overcharge was more radical than this. Assuming that the mortgage might have been foreclosed for the instalments of dues and interest already in default, and allowed still to stand as security for those not yet due, yet if the association assumed to treat them as all due, and to foreclose for the whole, it should have made a rebate of interest, so as to ascertain their present worth in gross. This present value was all that the association had a right to retain out of the proceeds of sale. The whole amount of unpaid dues on the 120 shares of stock was $7,416. At the date of foreclosure only $576 of this was due and payable. The remainder ($6,840), being payable in monthly instalments, running through a period of eight years, had an average of four years to run. Counting simple interest, at 7 per cent. per annum, the rebate on the $6,840 would be $1,496.25, making its present worth $5,343.75. This method of calculation would be more favorable to the defendant than the Maryland rule by the difference between true discount and bank discount. See Robertson v. American Homestead Assn. 10 Md. 397. To this sum of $5,343.75 add stock dues in default, $576; interest on $6,000, for 7⅔ months, $230; insurance paid, $45; six months' fines, $72; costs of foreclosure, $119.85,—making the total amount due on the mortgage at the date of sale $6,386.60. The amount for which the property was sold being $8,237.85, the surplus due the plaintiff was $1,851.25, instead of $1,843, as found by the trial court.

The attempt to call the gross amount of the stock dues for nine years "liquidated damages" is unavailing. The contract was not an alternative one; that is, one which, by its terms, might be executed

by doing either of several acts. Stipulating the damages and promising to pay them in case of default of an otherwise absolute undertaking do not constitute an alternative contract. The case is simply one of damages resulting from the breach of a contract for the payment of money, when the measure of such damages is susceptible of definite measurement, and where the parties will not be sustained in the enforcement of a stipulation for a further sum in the form of a penalty or liquidated damages. It also falls within the general rule that if the stipulated damages are clearly unconscionable, and so excessive as to be out of all proportion to the actual damages, the courts will disregard even the intention of the parties, and refuse to enforce the stipulation.

Judgment affirmed.